## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| VERO FINANCE TECHNOLOGIES, INC., | |
| Plaintiff, | CIVIL ACTION FILE |
| v. | NO. |
| JULIE MADDOX, | |
| Defendant. | JURY TRIAL DEMANDED |

## COMPLAINT

Vero Finance Technologies, Inc. ("Vero" or "Plaintiff"), by and through its undersigned counsel, hereby brings this Complaint against Julie Maddox ("Maddox") for injunctive and monetary relief, and makes the following allegations in support of its claims:

## THE PARTIES

1.      Plaintiff is a foreign profit business corporation with its principal place of business located at 287 Park Avenue S, Suite 700, New York, NY 10010.

2.      Julie Maddox is a former employee of Vero and a resident of Atlanta, Georgia. Maddox may be served with process at 1985 Main St. NW Atlanta, GA 30318.

## JURISDICTION AND VENUE

3.      This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, because Vero asserts claims against Maddox for violations of federal law, specifically the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et *seq.*

4.      This Court has supplemental jurisdiction over Vero's state-law claims under 28 U.S.C. § 1367(a), because they are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5.      This Court has personal jurisdiction over Maddox because she is a resident of Fulton County, Georgia.

6.      Venue is proper in this judicial district because, pursuant to 28 U.S.C. §1391(b), Defendant Maddox lives in this District, and as a result, a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this district.

## FACTS COMMON TO ALL COUNTS

### A.    Vero's Business

7.      Vero is a commercial lending platform that partners with banks and credit unions to offer inventory financing for dealers of manufactured goods.

8.      Through its d/b/a, Lever Auto, Vero provides "floorplan financing" or wholesale finance to automotive dealers, giving dealers an extended amount of time to pay for the purchase of their inventory.

9.      Manufacturers or distributors in the construction, transportation, and industrial industries use floorplan financing to develop extended payment terms for their dealers.

### B.    Maddox' employment with Vero

10.     Vero hired Maddox in September 2021. She held the position of Vice President of Sales and Operations. At all relevant times, Maddox primarily worked from home in Georgia.  She was on Vero's executive leadership team, handled account management and had sales operations responsibilities with respect to Lever Auto clients in Georgia, South Carolina, North Carolina and Virginia.

11.     Prior to starting employment with Vero, Maddox worked with NextGear Capital, Inc., another floorplan lender and a Vero competitor.

12.     In order to perform her job duties, and because she was a senior executive, Maddox had access to and relied upon vast amounts of proprietary and confidential data such as client lists, financing strategies, financing positions, lending processes, inventory valuations, budget data, and a wealth of other information. Many of these processes, procedures, and strategies are considered trade secrets.

13.     For example, Vero utilizes its proprietary operating system to underwrite, originate and monitor receivables generated by financing activities. Vero establishes unique funding arrangements with individual dealers based on their business model and the wholesale channels each dealer utilizes. Further, Vero has created proprietary tools to monitor dealers' financial and operational performance (marketing activities, bank transactions, cash flows, virtual audit application).

14.     Certain funding arrangements (*i.e.* funding non-auction purchases) used with Vero's dealers do not provide for the establishment of purchase money security interest in the underlying collateral – that information is not generally known to competitors in the market. Maddox had access to this information as well.

15.     All of the foregoing information would be invaluable to competitors. For that reason, Vero has policies and procedures in place to maintain the confidentiality of such information.

16.     Vero maintains and stores its trade secrets on a secure, password-protected computer network that only authorized personnel can access. Data is restricted to only those that have a business reason to access that data.

17.     As a member of Vero's executive leadership team, Maddox had unique access to data that was limited to others.

18.     Vero has a Handbook that informs employees, among other things, that they are prohibited from "Theft, misappropriation, or unauthorized possession or use of any property that does not belong to the employee" as well as "Sharing trade secrets or other confidential business information with anyone who does not have an official need to know."   A true and correct copy of the applicable handbook provisions are attached hereto as collective Exhibit A.

19.     The Handbook's confidentiality clause specifically informs employees that "Employees may not disclose any confidential information or trade secrets to anyone outside the Company without the appropriate authorization."

20.     The Handbook states that "Confidential information may include internal reports, financials, client lists, methods of production, or other internal business-related communications," among other things" and "Trade secrets may include information regarding the development of systems, processes, products, design, instrument, formulas and technology."

21.     In addition to the policies contained in the Handbook, Vero also requires employees to sign a Cybersecurity Policy and Non-Disclosure Agreements to protect its confidential and proprietary information.

22.     Vero's policies, in general, are disseminated regularly through email updates and available to employees via the company's payroll, benefits and human resource management platform, Gusto, as well as Google Drive.

23.     Maddox received the Handbook and other policies on or about March 21, 2022.

24.     At or around the time of Maddox' resignation, she was responsible for developing and maintaining existing business in Georgia, South Carolina, North Carolina and Virginia.  She had approximately 54 clients in these four covered territories.  The extent of Maddox' knowledge in the floorplan finance industry was immense – and extremely valuable to a company seeking to unfairly compete with Vero.

25.     In addition, Maddox had detailed knowledge and access to the Company's client lists, financing terms for each dealer relationship, lending processes, inventory valuations, and budget data.  All of this information is highly confidential and Vero's employees have a duty to treat it as such.

26.     Another way in which Vero protects this highly confidential is by requiring their employees to sign agreements designed to protect Vero's confidential information and business relationships.

27.     When Maddox was initially hired in 2021, she signed an Offer Letter which made her employment contingent upon the execution of a Proprietary Information and Inventions Agreement (the "PIIA"), attached as Exhibit B.

28.     The PIIA contained a confidentiality provision under which Maddox agreed not to use or disclose confidential or proprietary information during and after her employment**.  *See* PIIA, ¶4**.

29.     Maddox further agreed to "promptly return to Company all items containing or embodying Proprietary Information (including all copies)" upon her termination.  *See* **PIIA**, ¶4.

30.     The PIIA expressly prohibits the unauthorized disclosure of such "Proprietary Information" defined as "All Inventions and all other business, technical and financial information

(including, without limitation, the identity of and information relating to customers or employees) and "non-public information relating to Company's customers and prospects (including their needs or desires with respect to the types of products or services offered by Company, proposals, bids, contracts and their contents, the type and quantity of products and services provided or sought to be provided). *See* **PIIA¶ ¶ 4 and 7**.

31.     The PIIA also contained a non-competition and non-solicitation clause, under which Maddox agreed to not engage in certain "competing services" or impair, disrupt, damage or interfere with the Company's business for a one-year period following the termination of her employment for any reason.  *See* **PIIA, ¶¶ 5, 6**.

32.     Maddox agreed not to "solicit, induce, recruit or encourage sales from any of the Company's customers or prospects for any product or service that "involves competing services." *See* **PIIA, ¶7.**

33.     The term "Competing Services" is defined in the PIIA and includes (among other things) a service that "(i) competes with any product or service to be sold or provided by the Company, (ii) competes with any product or service intended to be sold or provided by the Company at the time of the termination of [her] employment with the Company, or (iii) competed with any product or service sold or provided by the Company at any time during [her] employment with the Company." *See* **PIIA, ¶7.**

34.     Maddox also agreed not to "perform, provide or attempt to perform or provide any Competing Services for a customer or potential customer of the Company."  **Id.**

35.     Both the non-compete and non-solicitation provisions described above remained in effect for a 12-month period following Maddox' termination for any reason, and extended to the

"Restricted Territory", defined as a one-hundred (100) mile radius of any of the following locations: (i) any Company business location at which I have worked on a regular or occasional basis during the preceding year; (ii) my home if I work from home on a regular or occasional basis; (iii) any potential business location of Company under active consideration by Company to which I have traveled in connection with the consideration of that location; (iv) the primary business location of a customer or potential customer; or (v) any business location of a customer or potential customer where representatives of the customer or potential customer which whom I have been in contact in the preceding year are based."  *See* **PIIA** ¶ 5.

36.     Maddox agreed that the geographical and temporal scope of the above covenants were/are reasonable in light of the value that such Confidential Information would bring to a competitor and the irreparable harm the Company would suffer from the unauthorized disclosure of such Confidential Information.  *See* **PIIA***,* ¶10.

37.     Maddox acknowledged that the Company would be entitled to injunctive and other equitable relief in the event of a breach.  *See* **PIIA, ¶10**.

## C.     Maddox resigns from Vero and breaches her contractual obligations.

38.     On Friday, May 20, 2022, Maddox informed Vero that she would be resigning her employment, effective immediately.

39.     Maddox returned her company-issued computer upon her resignation and her e-mails were suspended.

40.     Shortly after her resignation, Vero discovered that before she returned her computer, Maddox deleted all of the sent and received messages from her e-mail inbox as well as the contents of the hard drive on her company-issued computer and completely uninstalled the

computer's factory operating system.  This resulted in a complete wiping and destruction of data, which violated Maddox's obligations to preserve Vero information.

41.    On August 18, 2022, Vero performed an in-person audit of its inventory at Atlanta Auto Firm ("AAF"), a local pre-owned car dealer.  Nineteen Vero-financed vehicles were identified; six were reported as being at auction, one on test drive, one at a body shop and four were reported sold.

42.    Notably, Maddox had direct involvement in the onboarding of AAF as a Vero client and developing AAF's client portfolio.

43.    On August 25, 2022, Maddox performed an in-person audit of inventory at AAF on behalf of NextGear, her previous employer to whom she had returned to work for following her resignation from Vero.

44.    Maddox identified many out of trust units, financed by NextGear and other floorplan lenders.

45.    When a dealer like AAF sells out of trust, it uses proceeds from the sale of a financed unit/vehicle to purchase more units/vehicles as opposed to repaying its loan. This action places the dealer in default.

46.    Upon information and belief, AAF was in debt to NextGear in the amount of approximately $950,000 and out of trust with NextGear in the amount of roughly $300,000.

47.    On August 26, 2021, Maddox arrived at AAF and repossessed NextGear inventory worth approximately $650,000.

48.    Upon information and belief, Maddox on that same day and on behalf of NextGear, repossessed nearly $150,000 worth of Vero inventory that was still being financed.

49.    At this time, Vero had an arrangement with AAF to fund its non-auction purchases and did not have a purchase money security interest ("PMSI") in their AAF inventory, therefore, they could be repossessed by another lender with lien priority.

50.    NextGear's UCC lien, showing interest in the AAF inventory, was filed before Vero filed its lien, which placed NextGear in a higher lien position.

51.    Maddox had knowledge, through her employment with Vero, of particular funding arrangements that Vero had with dealers. She was astutely aware of the fact that Vero did not have a PMSI with AAF, which placed NextGear in a higher lien position with respect to the AAF inventory.

52.    With this knowledge, Maddox specifically targeted Vero vehicles for repossession rather than taking inventory directly owned by AAF or any other floorplan lender, improperly using Vero's confidential information and/or trade secrets on behalf of her new employer.

53.    Upon information and belief, none of the vehicles financed by Westlake Flooring Services or directly owned by AAF were repossessed.

**D.    Vero discovers repossessed inventory and notices Maddox breach**.

54.    On August 29, 2021, Vero received its first notice of insufficient funds from AAF and approximately $100,000 in insufficient funds were reported over the course of the next week.

55.    On August 31, 2021, Vero performed another audit at AAF and identified the vehicles Maddox repossessed as well other vehicles sold out of trust. Over the course of the next two weeks, Vero repossessed its remaining AAF inventory.

56.    On September 9, 2022, Vero sent a letter to Maddox regarding her improper seizure of AAF vehicles as well as her breach of the PIIA.

57.     Not only did Maddox violate the non-competition clause of her agreement by accepting re-employment with NextGear, but she has also, upon information and belief, shared critical information with her previous employer and potentially others and used that information to Vero's detriment, in violation of the PIIA confidentiality provisions.

58.     Maddox also violated the customer-specific non-competition clause of her agreement by providing services to AAF, a known client of Vero, that are akin to those she performed while employed with Vero and that directly compete with the products and services provided by Vero.

59.     Maddox surreptitiously took Vero's proprietary and confidential information and trade secrets related to its lending activities and used that information in her subsequent employment with NextGear to orchestrate the seizure of Vero-financed vehicles.

60.     Maddox's conduct reveals an improper intent to steal Vero's information and documents for her own benefit, the benefit of NextGear, and potentially the benefit other Vero competitors.

## CAUSES OF ACTION

### COUNT I
### Breach of Non-Competition Restrictive Covenant under the
### Proprietary Information and Inventions Agreement

61.     Plaintiff realleges and incorporates the foregoing allegations as if fully set forth herein.

62.     Upon accepting employment with Vero, Maddox executed the PIIA.

63.     The PIIA is a valid and enforceable contract.

64.    The PIIA and restrictive covenants contained therein are supported by adequate consideration, are reasonable in scope and duration, and are not more extensive than is reasonable and necessary for Vero to protect its legitimate business interests and goodwill.

65.    The PIIA contained a non-competition and non-solicitation clause, under which Maddox agreed to not engage in certain "competing services" or impair, disrupt, damage or interfere with the Company's business for a one-year period following the termination of her employment for any reason.  *See* **PIIA, ¶¶ 5, 6**.

66.    NextGear is a direct competitor of Vero in the floorplan financing industry.

67.    Upon information and belief, NextGear offered Maddox re-employment in the position of Risk, Fraud, & Credit Manager, a position similar to that which Maddox held with Vero, and a position that involves engaging in activities competitive to Vero. Thus, Maddox' employment with NextGear in this position violates her non-compete obligations to Vero.

68.    On NextGear's behalf, Maddox also performed competing services (as defined in the PIIA) with AAF, a Vero customer, similar to those services she performed for Vero.

69.    Upon information and belief, she is still responsible for managing dealer accounts, ensuring compliance with program terms, facilitating corrective actions that must be taken across the portfolio of actions and managing relationships with dealers.

70.    Vero has been harmed by Maddox' breach of the non-compete covenant in the PIIA and stands to suffer irreparable harm if Maddox is allowed to continue engaging in competitive activities in breach of the Agreement.

71.     The PIIA provides for injunctive relief in the event of a breach. Such relief is proper under the circumstances as it is the only way to fully prevent the harm caused by Maddox' continued employment with Vero.

72.     As a direct and proximate cause of Maddox' breach, Vero has suffered damages in an amount to be determined at trial.

**COUNT II**
**Breach of Customer-Specific Restrictive Covenant under the**
**Proprietary Information and Inventions Agreement**

73.     Plaintiff realleges and incorporates the foregoing allegations as if fully set forth herein.

74.     Upon accepting employment with Vero, Maddox executed the PIIA.

75.     The PIIA is a valid and enforceable contract.

76.     The PIIA and restrictive covenants contained therein are supported by adequate consideration, are reasonable in scope and duration, and are not more extensive than is reasonable and necessary for Vero to protect its legitimate business interests and goodwill.

77.     The PIIA contained a customer-specific non-competition clause, under which Maddox agreed to not "either directly or indirectly, separately or in association with others… perform, provide or attempt to perform or provide any Competing Services for a customer or potential customer of the Company." *See* **PIIA, ¶7(z).**

78.     NextGear is a direct competitor of Vero in the floorplan financing industry and AAF is a customer of both NextGear and Vero.

79.     As "Competing Services" are defined in the PIIA, Maddox should not have been involved in the business of servicing AAF on behalf of NextGear, especially since she serviced AAF in the same capacity as an employee of Vero.

80.     Maddox had direct involvement in acquiring AAF as a customer for Vero and therefore, had knowledge of the proprietary operating system that Vero uses to incorporate innovative technologies that enable it to monitor dealers in a way that gives it an advantage in the industry as compared to its competitors.

81.     Upon information and belief, Maddox has used Vero's non-public information related to AAF, to harm Vero while in NextGear's employ.

82.     Vero has been harmed by Maddox' breach of the customer-specific non-competition covenant in the PIIA and stands to suffer irreparable harm if Maddox is allowed to continue engaging in activities in breach of the Agreement.

83.     The PIIA provides for injunctive relief in the event of a breach. Such relief is proper under the circumstances as it is the only way to prevent the harm caused by Maddox' continued employment with Vero.

84.     As a direct and proximate cause of Maddox' breach, Vero has suffered damages in an amount to be determined at trial.

## COUNT III
**Breach of Confidentiality Obligations**
**under the Proprietary Information and Inventions Agreement**

85.     Plaintiff realleges and incorporates the foregoing allegations as if fully set forth herein.

86.     Upon accepting employment with Vero, Maddox executed the PIIA.

87.    The PIIA is a valid and enforceable contract supported by adequate consideration.

88.    The PIIA contained a confidentiality provision under which Maddox agreed to not use or disclose confidential or proprietary information during and after her employment. **See PIIA, ¶4**.

89.    The PIIA provides a detailed description of "Proprietary Information" and expressly prohibits the unauthorized disclosure of such information (*see* ¶ 4). Maddox further agreed to "promptly return to Company all items containing or embodying Proprietary Information (including all copies)." *Id.*

90.    As alleged in Paragraphs 24-42 above, Maddox used her knowledge of Vero's confidential lending practices and specific details related to Vero's relationship with its client AAF in her employment with NextGear.

91.    Vero has been harmed by Maddox's breach of her contractual obligations and will continue to suffer irreparable harm if Maddox is continued to breach the Agreement.

92.    The PIIA provides for injunctive relief in the event of a breach. Such relief is proper under the circumstances as it is the only way to prevent the harm caused by Maddox's continued breach.

93.    As a direct and proximate cause of Maddox' breach, Vero has suffered damages in an amount to be determined at trial.

## COUNT IV
### Violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836

94.    Plaintiff realleges and incorporates the foregoing allegations as if fully set forth herein.

95.    The information described in Paragraphs 12-15 above constitute trade secrets under the DTSA because they derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use, and because Vero took reasonable and practical measures to maintain the secrecy and confidentiality of its trade secrets and confidential information.

96.    Vero has invested substantial time and resources in developing its trade secrets to lawfully compete in the floorplan financing industry. Should its trade secrets become public or available to a competitor, they will lose their value to Vero. Because of the value of these trade secrets, Vero has made and continues to make efforts to protect their secrecy, including directing employees like Maddox to maintain the confidentiality of same.

97.    Maddox acquired Vero's trade secrets in connection with her employment and did so under a duty to maintain their confidentiality.

98.    Maddox acquired Vero's trade secrets and then took affirmative steps to hide the transfer of files or communications that would provide evidence of her misappropriation prior to commencing work for a competitor, NextGear.

99.    Maddox intended to take Vero's trade secrets and use them in connection with her employment with NextGear. Upon information and belief, Maddox has used, referenced, and/or disseminated Vero's trade secrets in the course of her employment with NextGear.

100.    Further and alternatively, even if Maddox has not yet used or disclosed Vero's trade secrets, the competitive nature of Maddox's current employment with NextGear will demand that

she disclose Vero's trade secrets, regardless of Maddox's intent to disclose or make use of the trade secrets.

101.    As a proximate result of Maddox's misappropriation of Vero's trade secrets, Vero has suffered, and will continue to suffer, irreparable harm and is entitled to the remedies provided by 18 U.S.C. § 1836(b)(3), including immediate injunctive relief and damages.

102.    Maddox's acts have irreparably harmed Vero and will continue to irreparably harm Vero unless enjoined by the Court, as a result of which Vero is without adequate remedy at law.

103.    Vero is thus entitled to an injunction preventing the actual and threatened continuing misappropriation of Vero's trade secrets; an order requiring Maddox to take immediate steps to protect and preserve Vero's trade secrets; a judgment for damages equal to Vero's actual loss caused by Maddox's misappropriations; a judgment for damages in the amount Maddox or NextGear has been unjustly enriched by Maddox's misappropriation; a judgment requiring Maddox to pay Vero exemplary damages equal to two (2) times any underlying damages award; and/or a judgment requiring Maddox to pay Vero for its attorney's fees and costs.

104.    Maddox's aforesaid acts have irreparably harmed Vero and will continue to irreparably harm Vero unless enjoined by the Court, as a result of which Vero is without adequate remedy at law.

## COUNT VI
## GEORGIA TRADE SECRETS ACT ("GTSA"), O.C.G.A. §10-1-760, et seq.

105.    Plaintiff realleges the foregoing paragraphs as if fully set forth herein.

106.    The confidential information and documents belonging to Vero as described herein constitute trade secrets under relevant provisions of the Georgia Trade Secrets Act of 1990, O.C.G.A. § 10-1-760, *et seq*.

107.    Vero's trade secrets consist of client lists, financing strategies, lending processes, inventory valuations, budget data and a wealth of other information. These trade secrets are timely, sensitive, strategic, and technical.

108.    The information qualifies as trade secret(s) because it is non-public and derives economic value from the fact that it is not generally known to the public or to Vero's competitors in the floorplan financing industry, and Vero takes reasonable steps to maintain the secrecy of such information such as password protecting its computer systems and requiring employees to sign employment agreements like the PIIA and other policies protecting its proprietary and confidential information.

109.    Vero has invested significant time and resources in developing its trade secrets. Vero made these investments because it uses the trade secrets to compete in the floorplan financing industry. Should the trade secrets become public or available to a competitor, they will lose their value to Vero. Because of the value of the trade secrets, Vero has made and continues to make extensive efforts to maintain the confidentiality of the trade secrets.

110.    Maddox acquired Vero's trade secrets in connection with her employment and did so under a duty to maintain their confidentiality. Maddox acquired Vero's trade secrets and then commenced work for a competitor, NextGear.

111.    She resigned her employment with Vero and purposefully deleted files and other electronic data and information from her company-issued computer without returning proprietary and confidential information to Vero.

112.    Maddox intended to take Vero's trade secrets and use them in connection with her employment with NextGear. Upon information and belief, Maddox has used, referenced, and/or

disseminated Vero's trade secrets in the course of her employment with NextGear – without Vero's consent.

113.   Further, even if Maddox has not yet used or disclosed Vero's trade secrets, the competitive nature of Maddox's current employment with NextGear will demand that she disclose Vero's trade secrets, regardless of Maddox's intent to disclose or make use of the trade secrets.

114.   Defendants' misappropriation was willful and malicious; therefore, Plaintiff is also entitled to exemplary damages and attorney's fees pursuant to O.C.G.A. §§ 10-1-763(b) and 10-1-764.

115.   As a proximate result of Maddox's misappropriation of Vero's trade secrets, Vero has suffered, and will continue to suffer, irreparable harm and is entitled to the remedies provided under Georgia law, including injunctive relief, exemplary damages and attorneys' fees.

116.   Vero is thus entitled to an injunction preventing the actual and threatened continuing misappropriation of Vero's trade secrets; an order requiring Maddox to take immediate steps to protect and preserve Vero's trade secrets; a judgment for damages equal to Vero's actual loss caused by Maddox' misappropriations; a judgment for damages in the amount Maddox or NextGear has been unjustly enriched by Maddox's misappropriation; a judgment requiring Maddox to pay Vero exemplary damages; and/or a judgment requiring Defendant to pay Vero for its attorney's fees and costs.

117.   Maddox's aforesaid acts have irreparably harmed Vero and will continue to irreparably harm Vero unless enjoined by the Court, as a result of which Vero is without adequate remedy at law.

## COUNT VII
### Tortious Interference with Business and Contractual Relationships

118.    Plaintiff realleges the foregoing paragraphs as if sully set forth herein.

119.    Vero maintained a business and contractual relationship with Maddox, specifically including, but not limited to, the PIIA and the parties' obligations under that Agreement.

120.    Maddox knew of her obligations when she accepted employment with NextGear and unlawfully used Vero's confidential information and trade secrets to compete with Vero on behalf of NextGear.

121.    Maddox also knew of her obligations under the PIIA when she engaged AAF as a client of NextGear and subsequently facilitated the seizure of Vero-financed vehicles from AAF.

122.    Maddox' conduct tortiously interfered with Vero's contractual and business relationships with its client, AAF.

123.    The foregoing actions were willful, taken in bad faith and with intent to damage Vero and has caused damages, injuries, and irreparable harm to Vero.

### PRAYER FOR RELIEF

WHEREFORE, Vero requests the following relief:

(a)    That Defendant be enjoined, preliminarily and thereafter permanently, from retaining, using or disclosing any of Vero's trade secrets, confidential information, or property;

(b)    That Defendant be ordered to identify all people or entities with whom any of Vero's information has been shared (or on whose computer systems such information has been stored), in whole or in part, whether in writing, electronically, or orally;

(c)    That Defendant be enjoined from using any document or information containing or derived from Vero's trade secrets, confidential information, and property;

(d)    That Maddox be preliminarily, then permanently, enjoined from working for NextGear.  Because of the scope and importance of the trade secrets Maddox misappropriated from Vero, her overt and improper use of Vero's information as related to AAF, and because she has gone to work for a direct competitor, this is one of the appropriate situations where the Court should enjoin Maddox from engaging in competitive activities to prevent her engaging in further improper conduct;

(e)    That Defendant pay damages to Vero for any actual losses, damages, or unjust enrichment caused by Defendant's breach of her contractual obligations to Vero and by Maddox's misappropriation of Vero's trade secrets, confidential information or property;

(f)    That Defendant be ordered to pay punitive damages, exemplary damages, attorneys' fees, and litigation costs, based upon her violation of federal law and state common law for her bad faith in allowing the unlawful taking and use of Vero's property and trade secrets;

(g)    That Defendant be ordered to pay the costs of these proceedings;

(h)    That Plaintiff be granted a trial by jury on all issues so triable; and

(i)    The Court order such other and further relief as it deems appropriate.


[*Intentionally left blank*]

[*Signature on following page*]

Respectfully submitted this 20th day of October, 2022.

HAWKINS PARNELL & YOUNG LLP

/s/ Matthew A. Boyd
_____
Ronald G. Polly, Jr.
Georgia Bar No. 583264
rpolly@hpylaw.com
Matthew A. Boyd
Georgia Bar No. 027645
mboyd@hpylaw.com
303 Peachtree Street - Suite 4000
Atlanta, Georgia 30308
Telephone:    (404) 614-7400
Facsimile:    (404) 614-7500

*Attorneys for Plaintiff Vero Finance Technologies, Inc.*